**UNITED STATES of America**

**v.**

**William Edward ZEILER.**

**UNITED STATES of America**

**v.**

**William Edward ZEILER and Richard Peter Chiocca.**

**Cr. Nos. 67-186, 67-187.**

United States District Court

W. D. Pennsylvania.

Jan. 5, 1968.

Gustave Diamond, U. S. Atty., by Stanley W. Greenfield, First Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

James P. McKenna, Jr., Pittsburgh, Pa., for defendant, William Edward Zeiler.

## OPINION AND ORDER

MARSH, District Judge.

The defendant, William Edward Zeiler, has been indicted for a series of 11 bank robberies in Pittsburgh, Pennsylvania, since April, 1963. The perpetrator of these robberies, acquiring considerable notoriety, has been nicknamed the "commuter bandit" meaning a robber thought by the news media to have resided in a suburb of Pittsburgh. Widespread public interest over the years has been created by the bandit's periodical robberies and his ability to avoid detection. A composite sketch of the bandit had been drawn.

The defendant moved "to suppress for use at trial any testimony by eyewitnesses on the grounds that said testimony is rendered incompetent as a result of the publicity attendant to the arrest and arraignment on the Complaint of the defendant William Edward Zeiler, said publicity being attributable to arresting authorities." A hearing was held.

The defendant was arrested by the F.B.I. and city police on June 23, 1967 in Pittsburgh. On July 6, 1967, an official lineup was held attended by the defendant's appointed counsel and "more than fifty people, all victims of the 'commuter bandit' * * *" (T., p. 23).

When the news of the arrest leaked out, representatives of the news media, including press and television photographers, crowded into the basement of the Federal Building in Pittsburgh and televised and photographed the defendant, with his hands handcuffed behind his back and a belt across his upper waist, being conducted by several officers from an automobile into the elevator leading to the 13th floor where the F.B.I. offices are located. He was also televised as he was being conducted down a hall on the 13th floor to the F.B.I. offices. Comment by the agent in charge of the F.B.I. in Pittsburgh was taped and heard. The pictures and comment were broadcast over channels 2, 4 and 11, the major television channels in the Pittsburgh area.

There was no evidence of the number of times the television films were broadcast or the actual time they consumed on the air. An opportunity was given defendant's counsel to submit this data after the hearing but he has not done so (T., pp. 77–78). We assume that each channel broadcast the pictures several times on or about June 23, 1967.

At the hearing 16 newspapers [1] were received into evidence (Exs. A–1 to A–16), two of them being duplicates (Exs. A–7, A–9). Each published an article about the defendant. Exhibit A–2 displayed a picture of defendant and the composite sketch of the suspected "commuter bandit" on the front page. Exhibit A–1 published a picture of the defend-

[1]. The newspapers were the Pittsburgh Post Gazette and The Pittsburgh Press, being the two major newspapers in the Pittsburgh metropolitan area.

ant on the front page and the sketch on page 3. Exhibit A–3 published a picture of defendant on page 23. The newspaper articles indicated that the defendant was thought to be the alleged "commuter bandit".

The defendant's counsel contends that the aforesaid publicity preceding the formal lineup on July 6th was so pervasive that the victims of the robberies and other eyewitnesses were psychologically conditioned to identify the defendant as the "commuter bandit" at the formal lineup. But it is also conceivable that the pictures of the defendant might well have emphasized to the witnesses that the defendant was not the robber who had held them up and robbed the banks involved.

■■■ It was not proved that the prosecuting authorities planned or initiated the arrest publicity in the Federal Building on June 23, 1967. The picture taking was not designed by the authorities as a pre-lineup identification technique. It was not shown that the arresting officers encouraged or assisted the news media in photographing or televising the defendant.[2] No statute, rule or regulation requires federal arresting officers to take evasive action to avoid photographing or televising an accused person. It seems to us that if picture taking or televising an accused person is deemed to affect identification testimony and deprive him of a fair trial, it will have to be prohibited by a statute which may collide with the First Amendment. Needless to say, it is presently common practice for the news media in the Pittsburgh area to take pictures and televise accused persons upon their arrest for publicized crimes.

■■■ The court finds from the evidence that the pre-lineup publicity given the defendant was not so egregious, flagrant and pervasive that, as a matter of law,

all eyewitnesses to the robberies were psychologically conditioned to identify him as the bank robber. It is noted that subsequent to the highly suggestive picture publicity of defendant's arrest, newspaper accounts and television accounts of his neighbors and his counsel gave an impression that it was quite unlikely that defendant was the "commuter bandit". This was also true of television broadcasts of the defendant himself subsequent to the formal lineup.

We cannot accept the defendant's most cogent argument that if eyewitnesses compared the composite sketch with the clear, closeup photographs (Exs. A–1 and A–2), or saw the televised pictures of defendant under arrest and heard the broadcasts, that that subconscious suggestive influence rendered all of them incapable of functioning discriminately at the lineup two weeks later and incompetent to testify at the trial. Accordingly, the court concludes that eyewitnesses to the bank robberies are competent. Their credibility will be for the jury.

■■■ We assume, without deciding, that the arrest of defendant and his transportation through the Federal Building to the F.B.I. offices were critical stages of the proceedings against him, but his Sixth Amendment right to counsel was not violated because he did not say anything exculpatory or inculpatory. Even if his counsel had been present at the Federal Building, neither he nor the arresting officers could have prevented the news media from taking pictures of the defendant. It is doubtful that counsel or the arresting agents could have had the photographers ejected from the Federal Building, but even if this could have been accomplished, it was inevitable that news of the arrest and pictures of the alleged "commuter bandit" would have been ferreted out and promptly published. See: Ex. A–3.

2. The Code of Federal Regulations, Title 28, Ch. I, § 50.2(b) (7), prescribes:
"Personnel of the Department of Justice should take no action to encourage or assist news media in photographing or televising a defendant or accused person being held or transported in federal custody."

■ During the televising, the F.B.I. agent in charge made reference to the fingerprints of the defendant by quoting a portion of the Complaint which was filed with the United States Commissioner in support of the warrant for the arrest of the defendant. The Complaint is a public record; thus, there was no impropriety in revealing that which could be discovered by the news media or anyone else upon inquiry. Indeed, the regulations permit such personnel to make public the substance of the Complaint. 28 CFR 50.2(b) (3) (ii).[3] In this respect the court finds that the law enforcement personnel did not unduly cooperate in the publicity attendant upon the defendant's arrest.

■ Defendant's counsel, inter alia, relies on United States v. Wade, 388 U.S. 218, 87 S.Ct.1926, 18 L.Ed.2d 1149, decided by the Supreme Court on June 12, 1967. We do not think that decision supports the defendant's motion to suppress eyewitness testimony on the ground of incompetency. Defendant's counsel argues that the defendant was entitled to the presence of his counsel at the "lineup" which was in fact held on and after June 23rd when the defendant's arrest was broadcast and his pictures were published in the newspapers. Although there was no actual proof that any eyewitness of any robbery saw the photographs or the television pictures of the defendant, it may be confidently assumed that the victims of the robberies would be most curious and in all probability would examine and view them with great interest. And we agree with counsel that there are inherent dangers in improper suggestive influences which produce psychological impacts upon eyewitnesses who have compared newspaper pictures of the defendant with a composite sketch (Exs. A–1, A–2), and who have viewed the vivid broadcasts of his arrest and transportation in federal custody and read and listened to comment concerning the apprehension of the alleged "commuter bandit". But, we are of the opinion that the necessity of the presence of defendant's counsel as required by *Wade* has to all intents and purposes been met. Defendant's counsel subpoenaed and brought to the hearing the relevant newspapers and exhibited the television broadcasts. He has seen and heard exactly what any eyewitness has seen and heard. He not only knows but has studied the dangers inherent in the suggestions that the defendant was the "commuter bandit". Thus, he is enabled to meaningfully cross-examine the identification witnesses who may testify against defendant and attack the credibility of those who saw the pre-lineup pictures and heard the broadcasts. He is enabled to lessen the effect of the inherent dangers by bringing out on cross-examination the suggestive influences to which any such witness was exposed. He can do exactly what the Supreme Court in *Wade* has said can be done by a defendant's counsel who is present at a formal lineup, i. e., to observe in order to be able to subject to effective scrutiny at the trial improper, suggestive and unfair influences upon identification trial witnesses who undertake to identify an accused bank robber long after the robberies. We conclude that the defendant has not been deprived of his Sixth Amendment right to counsel in any real or meaningful sense, and that his motion to suppress eyewitness testimony should be denied.

An appropriate order has been entered.

3. Cf. 28 CFR 50.2(b) (6) (iii).