UNITED STATES of America,
Plaintiff-Appellee,

v.

David Lee PEACOCK, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

William Lee FREEMAN, Defendant-
Appellant.

Nos. 17983, 17984.

United States Court of Appeals
Sixth Circuit.

July 31, 1968.

As Amended October 31, 1968.

Certiorari Denied Jan. 13, 1969.

See 89 S.Ct. 635, 665.

Michael Ritz, for Elmer A. Giuliani (Court Appointed), Cleveland, Ohio, (Elmer A. Giuliana, Cleveland, Ohio, on the brief), for appellant Peacock.

Frank E. Haddad, Jr., Louisville, Ky. (Jack G. Day, Cleveland, Ohio, on the brief), for appellant Freeman.

Harry E. Pickering, Asst. U. S. Atty., Cleveland, Ohio, (Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on the brief), for appellee.

Before PHILLIPS and EDWARDS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

David Lee Peacock and William Lee Freeman were convicted by a jury of the armed robbery of a bank insured by the Federal Deposit Insurance Corporation. They appeal.

On July 18, 1963, at about 10:30 A.M., the Continental Bank in East Cleveland, Ohio, was held up by two robbers armed with guns. At the time, three bank employees were working—the manager, the assistant manager, and the teller. Two of them were forced to lie down on the floor behind the counter, and the third ordered to stand nearby facing the wall. The two holdup men then went through the teller's drawers, taking with them more than $18,000. The three employees were then herded into the basement and told to remain there while the robbers made their getaway. The manager called the police from a basement phone and afterward, going upstairs, he saw, through the wide high windows of the bank "a red Chevrolet—a Corvair type," cut across the premises of a Gulf Oil Company service station and swiftly drive away. The manager stated that there were two men in the car, and that it did not have Ohio license plates.

At about 11:00 A.M., half an hour after the robbery, Special Agent Michael J. Walsh, Jr., of the FBI, had reached the neighborhood minutes after the police call had been received, and was searching for an automobile described as a red Corvair with out-of-state license plates. Shortly thereafter, he found it nearby. It was a 1962 red Corvair with out-of-state license plates, standing in the parking lot of the Cleveland Transit System which was located only a short distance from the bank. This Corvair had Maryland license plates and the car's serial number was soon found to be identical to that on a Maryland Certificate of Title for a 1962 Corvair belonging to Robert Murphy of Adelphi, Maryland. This car had been stolen thirty days before the bank robbery from a parking garage in Arlington, Virginia. Mr. Murphy was approaching the garage to get his car when he had seen it, only twenty feet distant, being rapidly driven away.

Appellant defendant Peacock, at the time of the trial in this case, was in the course of serving, in a federal prison, two concurrent sentences for two separate bank robberies, one in Memphis, Tennessee, and the other in Chevy Chase, Maryland, to which he had pleaded guilty. The bank robbery in Memphis had occurred in March 1963, and the one in Chevy Chase in October 1963—one, just before the robbery in the instant case, and one, just afterward.

Appellant defendant Peacock was indicted in this case on June 24, 1965, nearly two years after the robbery; and appellant defendant Freeman was likewise indicted at the same time.

How the FBI arrived at the conclusion that the two appellant defendants were implicated in the bank robbery does not appear. It may have been that the fact that Peacock had been indicted in Tennessee for a bank robbery shortly before

the one in the instant case, and had been indicted for another bank robbery in Maryland shortly after, and had pleaded guilty in both cases, led the FBI to an investigation as to whether he might be guilty of robbing this bank in East Cleveland, Ohio.

In 1963, Peacock lived in Louisville, Kentucky, just south of East Cleveland, Ohio, and north of Memphis, Tennessee. Moreover, Peacock was known to Special Agent Robert Domalewski in Louisville, in 1963. Peacock, at that time, owned a 1963 green Corvair with Kentucky license plates. Agent Domalewski testified that he had seen Peacock's green Corvair, on a number of different occasions, in Louisville in 1963, and had seen this car parked in the driveway at Peacock's home in that city.

It appears, then, according to the Government, that a green Corvair with Kentucky license plates, and a red Corvair with Maryland license plates were involved in this robbery. This, at first, seems somewhat confusing; but it is clarified when it is remembered that the green Corvair was a Kentucky car owned by appellant Peacock, and the red Corvair was the getaway car which, as hereafter appears, was stolen in Virginia. Why a getaway car used in a robbery in Cleveland, Ohio, should be stolen and brought all the way from Virginia for that purpose is not necessary to explain. But the fact that one of the robbers was seen in Ohio, and in Virginia, and that a Corvair car was used in the getaway suggests that the driver of the Kentucky Corvair picked up the Corvair in Virginia because he was accustomed to driving that make of car, and could more easily and confidently use it in a crime which required speed and maneuverability in a quick holdup and a quick getaway.

Lois MacNeil testified that she met defendant Peacock in Arlington, Virginia, in late June 1963; that she was introduced to him, in her own home, by a friend, Joan Maier; that Peacock drove a green Corvair, and was staying at the Clarendon Motel, about five blocks from where the red Corvair getaway car was stolen; that she dated a man named Louis Snowden, who was with Peacock; that she saw Peacock several times between June and October 1963, and that Peacock introduced her to defendant Freeman in Arlington in October 1963.

With regard to the Clarendon Motel in Arlington, the owner produced business records showing registration at his motel of one "Harold Jackson" on June 26, and, further, that this man had checked out of the Clarendon Motel by noon on June 28, 1963, shortly after Mr. Murphy's red Corvair had been stolen. The owner of the motel further testified that "Harold Jackson" at the time he stayed at the Clarendon Motel, was driving Peacock's car with its 1963 Kentucky license, J 50–940.

It may have been that after Special Agent Walsh found the red Corvair, which had been stolen in Arlington, the FBI conducted an investigation there and found that Peacock's car was in that city at the time the Murphy car was stolen; that various people there had known Peacock, and that they had been introduced to defendant Freeman by Peacock. It is also reasonable to suppose that the FBI figured, after Peacock had pleaded guilty to robbing a bank in Chevy Chase just before the robbery in East Cleveland and in Memphis, just afterward, that he was a likely suspect as one of the robbers of the East Cleveland Bank; and since Special Agent Domalewski had known Peacock in Louisville in 1963, and Peacock was known to have a green Corvair with Kentucky license plates, they concluded that the use of this car at the time of the robbery in East Cleveland, Ohio, should be investigated. Whatever the fact, the FBI traced, by the record of a Standard Oil Company credit card, the use and route of the Peacock car during the critical periods. They found by such credit-card purchases of oil and gas that the Peacock car had been driven from Lexington, Virginia, on June 28, 1963, (the date when the red Corvair had been stolen) to Charleston, West Virginia; that on June 30, 1963, the car had been

driven from Charleston to Cincinnati, Ohio; that on July 2, 1963, it had been driven from Cincinnati, Ohio, to Louisville; that there were three trips made from Louisville to Cleveland, Ohio, on July 4, July 12, and July 17, 1963, the day before the bank robbery at East Cleveland. All of the purchases made with the Standard Oil credit card were for the green Corvair with Kentucky license plates, which was owned by Peacock.

But not only was the route of the Peacock car traced by the credit card purchases, but the credit card itself had been issued on the application of, and in the name of, appellant defendant Freeman; and the discovery of this fact catapulted Freeman right square into the center of this case. Defendant Freeman lived in Louisville; defendant Peacock lived in Louisville.

The FBI thereafter found from interviewing witnesses that defendant Freeman had actually made the trip in the green Corvair with Peacock, and with a woman friend of Peacock, from Louisville to East Cleveland on the day before the bank robbery; and that Peacock and his woman friend had returned from Cleveland to Louisville on the afternoon of the robbery, without Freeman.

Prior to his arrest, defendant Freeman called at the office of the FBI in Louisville on several occasions, after he had found himself under suspicion of being implicated in the bank robbery in the instant case. He, there, in attempting to clear himself of all connection with the robbery, admitted to Special Agent Domalewski that he had, in fact, driven from Louisville to Cleveland, Ohio, with defendant Peacock, and with Peacock's girl friend, sometime during the summer of 1963. He further said that he had received a $50 Western Union money order on this occasion from Bernita Fay Foster. Mrs. Foster afterward testified, without contradiction, that defendant Freeman had called her from Cleveland; said that he was running short of money and had asked her if she had any money at the time. She replied that she did not, but would get it for him; and, thereafter, she pawned his television set and sent him the money by Western Union to Cleveland on July 17, 1963, the afternoon before the bank robbery. Defendant Freeman, at the time he called upon Special Agent Domalewski, told him that he had no reason for going to Cleveland at the time, but had simply ridden along to share expenses, and he further stated that he did not stay overnight in Cleveland. However, the testimony on the trial was undisputed that defendant Freeman did stay overnight in Cleveland in the same motel room with defendant Peacock and his girl friend. Defendant Freeman, in coming to see Special Agent Domalewski, volunteered the information that he had several guns at home; and he stated that they included a Colt revolver, a .22 caliber Luger, and another .32 caliber Derringer pistol. He further voluntarily furnished his fingerprints and agreed to be photographed.

After all of these voluntary statements had been made by defendant Freeman, together with his expressed willingness to furnish his fingerprints and to be photographed, Special Agent Domalewski, after further investigation, proceeded, with another agent of the FBI, to defendant Freeman's apartment to arrest him for the East Cleveland, Ohio, bank robbery, and, having been freely admitted to the apartment by Mrs. Freeman, thereupon arrested defendant Freeman. When Special Agent Domalewski first went to defendant Freeman's bedroom to arrest him, Freeman was in the shower bath. The agents told Freeman that they had a warrant for his arrest, and asked him to get dressed. At the time, they noticed, on the top of the dresser in the bedroom, two guns—a .38 caliber over and under Derringer-type pistol, and a .32 caliber short-barrelled Smith and Wesson revolver, both fully loaded. Also, on Freeman's dresser, was a wallet containing $780.00 in currency. Freeman told Agent Domalewski that the money had been received by him that morning as part of an insurance settle-

ment arising out of an automobile accident. Special Agent Domalewski apparently accepted this explanation, made no further investigation as to the money, and left the wallet where it was on the dresser with defendant Freeman and Mrs. Freeman. However, Special Agent Domalewski took along with him the two loaded revolvers, only "as a matter of precaution and safekeeping," and later checked upon them in Louisville, not to trace anything with regard to their use in the East Cleveland bank robbery, or the length of time during which they had been in Freeman's possession, but only to ascertain whether they had been reported as stolen, and he checked them for that purpose at the Bureau of the FBI in Washington. He did not take the pistols with him with any idea of trying to establish whether they had been used in the bank robbery. It would have been impossible to do that from the weapons themselves. Defendant Freeman told Special Agent Domalewski that the guns were registered to him in Louisville and, apparently, no one ever questioned that fact.

We come then to the evidence as to what took place on the morning of the holdup of the bank in East Cleveland, Ohio, and the evidence relating to the two appellant defendants on that day.

Both appellant defendants were together in Cleveland, Ohio, during the night of July 17, before the day of the robbery, according to the undisputed testimony of the woman who was with them there, who knew nothing about their plans of robbery, at that time or afterward. Both defendants were together in Cleveland on the morning of the robbery, according to the same undisputed testimony, although Freeman had denied this fact when he came to see Special Agent Domalewski at the FBI office in Louisville, some months before his arrest.

Shortly before the robbery, Frank Maruna went to the bank in question to transact some business, and, as he was going into the bank, he noticed a red Corvair with out-of-state license plates parked at such an angle that it faced the bank. There were two men sitting in the front seat of the car talking to each other. As he went toward the bank, Mr. Maruna passed within a foot of the car. After he had been in the bank about ten minutes, Mr. Maruna came out. He again saw the two men sitting in the front seat. On the trial, he identified defendant Freeman as the man sitting in the front seat facing the driver. On the day of the robbery, Mr. Maruna reported to the police that, as he remembered it, the license plates had six digits on them. He thought the first were 531 and upon further recollection, he thought the numbers were 531031. However, his recollection was faulty, as the red Corvair getaway car that had been stolen from Arlington, Virginia, actually had license plates DM 9114.

About three weeks after the robbery, Mr. Maruna, upon being shown a number of pictures, stated that the picture of one Edward Grimm resembled the man he saw in the car just before the holdup. Defense counsel asked that the Government produce the photograph of Edward Grimm and the District Court sustained the Government's objection to such request.

Mr. Karl Burkhardt, the manager of the bank that was robbed, positively identified defendant Peacock as one of the men who entered the bank with a gun and ordered him to lie down on the floor.

Robert Murphy, the owner of the red Corvair getaway car, which had been stolen in Arlington, testified on the trial that he had seen the man who was stealing his car from the garage pass him only twenty feet away; and on the trial he identified that man as defendant Peacock.

■ It is contended that the evidence was insufficient to sustain a verdict of Freeman's guilt, and, in this regard, we will merely outline what has been heretofore recited with respect to the evidence of guilt as to both defendants.

Peacock was in Arlington, Virginia, in late June, according to the undisputed testimony of Lois MacNeil. He was staying at the Clarendon Motel. A man who had a car with Peacock's license plates signed the name of "Harold Jackson" on the Clarendon Motel register on June 26, 1963, and checked out about noon of June 28, shortly after the red Corvair getaway car had been stolen about five blocks from the motel. On the trip back from Virginia, gas and oil were purchased for Peacock's car at a number of places, being charged to the Standard Oil credit card issued to defendant Freeman, and these purchases continued until Peacock's green Corvair arrived back in Louisville. Later, three trips were made to Cleveland and return in Peacock's green Corvair, with oil and gas purchases en route made on Freeman's credit card. It is undisputed that Freeman went to Cleveland with Peacock and his girl friend the day before the robbery; that Freeman and Peacock stayed together just outside Cleveland that night, and were together the morning of the robbery at East Cleveland. Peacock was identified as the man who stole and drove away the red Corvair from the garage in Arlington, by the owner of the car, Mr. Murphy. Freeman was identified as one of the two men in the red Corvair getaway car just outside the bank, minutes before the robbery. Later in October, Peacock and Freeman were together in Arlington, Virginia, and Peacock introduced Freeman to his friends at that time. Two men held up the bank. Two men made their getaway in the red Corvair.

From the fact that Peacock and Freeman were together on the trip from Louisville to Cleveland the day before the robbery, paying for oil and gas purchases en route with Freeman's credit card, and the fact that Freeman was seen a few minutes before the holdup in front of the bank, in the red getaway car that Peacock had stolen in Arlington, and from the other evidence heretofore recounted, the jury could properly draw inferences that Peacock and Freeman were the men who held up the bank at East Cleveland.

It is to be remarked that Freeman alone raises the question as to the sufficiency of the evidence to support the verdict of guilt.

██ Defendant Peacock contends that he was denied the right to a speedy trial guaranteed him by the Sixth Amendment.

Peacock was arraigned October 15, 1965, and tried February 4, 1967. During this time he was serving a long sentence for two other bank robberies. Priority in the trial of criminal cases is given to those defendants who are incarcerated and unable to make bail. At the time of his arraignment, Peacock was assigned competent and qualified counsel. The delay between Peacock's arraignment and trial, coupled with the fact that he was then serving long sentences for bank robberies on his pleas of guilty, resulted in no violation of Peacock's rights under the Sixth Amendment.

Both Peacock and Freeman contend that it was reversible error for the trial court not to make a formal ruling against the admissibility in evidence of the guns which Special Agent Domalewski saw on defendant Freeman's dresser at the time he arrested him.

The guns were never admitted in evidence. Counsel for defendant Freeman, during the course of the trial, stated to the court before anyone had testified about the guns, the following:

"If the Court please, while we are up, may I make a motion which may be somewhat anticipatory. But I think I have got to put the Government on notice, if there is any testimony about the revolvers in this case we intend to object.

"We ask the Court now to instruct the Government not to do anything with respect to the revolvers which were mentioned in the FBI report, because they were registered guns, bought after the time of this incident.

"We therefore object to any reference to them, or any introduction of them into evidence."

The trial court stated that it would act upon the objection at the proper time.

Later, Special Agent Domalewski, while testifying about going to defendant Freeman's apartment to arrest him, stated that when Freeman had come out of the shower bath and was dressing in his bedroom, he saw that there were two guns on Freeman's dresser—one, a loaded .38 caliber pistol, and the other, a loaded .32 caliber pistol. They were offered in evidence by the Government, but the court refused, at the time, to admit them, and they were thereafter marked for identification, the court stating that it would reserve a ruling until further evidence developed. They were then identified by Special Agent Domalewski as the loaded guns which he had seen on Freeman's dresser, and which he took with him as a matter of precaution and safekeeping. On cross-examination by defendant Freeman's counsel, Agent Domalewski was asked:

"Q. On that occasion—I'm speaking now again about September 2, 1964, when he was at the FBI office where he appeared voluntarily—he told you that he had had several guns, all of which were registered to him, and he identified them as a Colt revolver and a .22 caliber Luger, and another .32 caliber pistol, a Derringer, at the present time, that he was talking to you, did he not?

A. I recall he mentioned several guns, yes, sir."

\* \* \* \* \* \*

"Q. If he volunteered that information, that he had pistols, wouldn't it have been natural for you to say, 'Do you mind if we look at these pistols'?

A. It could have been, but I didn't. No reason to.

Q. Whether you had any reason to, as a matter of opinion for you, you could have, could you not?

A. Yes, but I usually do things with a reason. Most people do.

Q. You were looking for two pistols, were you not, that were used in this bank robbery?

A. I think we were looking more for two people rather than two pistols.

Q. In other words, you were going to pass up trying to find two pistols that might have been used in the bank robbery; is that correct?

A. Not necessarily, but how could anyone identify, specifically identify, two pistols that were used in a bank robbery?

Q. I agree with you 100%, but if I understand you, are you contending, or is it your contention, that the two pistols that you took from Freeman's apartment the day that he was arrested are similar to the pistols that were used in this bank robbery?

MR. PICKERING: Objection. We are making no such contentions. He already said he didn't know how the witnesses described the weapon.

THE COURT: In view of the statement of the United States Attorney I will sustain the objection. There is no contention that these were used in the robbery.

MR. HADDAD: At this time, your Honor, if that is the situation, I would like to renew our motion to exclude from the evidence these two pistols that the man has a right to have in his home.

THE COURT: They haven't been offered yet.

MR. HADDAD: I would like to include in that motion, if your Honor please, a motion to exclude all testimony, then, concerning the pistols.

THE COURT: Overruled."

Thereafter, the District Court instructed the jury, during the course of the trial, as follows:

"THE COURT: Members of the jury, there have been certain motions made with reference to the testimony relative to the guns which have been introduced into evidence by the previous witness.

The Court has given the matter consideration.

These guns, as you recall from the testimony, were found on the dresser in the home of Defendant Freeman at the time of his arrest.

There has been no testimony connecting these guns with the robbery which occurred on July 18, 1963. For that reason the Court has granted the motion made by counsel for the defendants and wishes to state to the jury that the guns taken at the time of the arrest of Mr. Freeman are not evidence in this case.

In fact, the Government has admitted that these guns were not connected, as far as they could determine, with the robbery.

I instruct you that you are not to speculate or make any inference from the fact that there is testimony received regarding these weapons.

The examination was only for the purpose of determining whether the weapons were relevant to the issues of the case.

The Court has determined that they are not relevant. There is no tie-in. There is no testimony that these guns were used in the robbery.

The jury, therefore, may not consider the testimony regarding these weapons or the fact that they were offered in evidence in any manner whatsoever."

■ We find no reversible error with regard to the discussion of the guns before the jury. They were never admitted into evidence, and the District Court, after a meticulous consideration of their bearing on the case, told the jury that the guns taken at the time of the arrest of defendant Freeman were not evidence in the case; and that the Government had admitted they were not connected with the bank robbery. The court distinctly instructed the jury that they were not to speculate or make any inference from the fact that there was testimony regarding the guns; *that the examination, in this respect, was only for the purpose of determining whether they were relevant to the issues in the case*; that the court *had determined they were not relevant*; that there was no tie-in; and that there was no testimony that the guns had been used in the robbery. The court concluded by telling the jury that it could not consider the testimony regarding the guns or the fact that they were offered in evidence, in any way whatsoever. There was no error in the trial arising out of the remarks before the jury about the guns or their proper admission in evidence.

It may here be emphasized that the first mention that defendant Freeman had guns in his possession came from Freeman himself, when he called upon Special Agent Domalewski at the FBI office in Louisville in an effort to dissipate suspicion that he was connected with the bank robbery. It was then that he told for the first time that he possessed several guns and that he identified three of them as being a Colt revolver; a .22 caliber Luger, and a .32 caliber Derringer; and he told about having these guns to Special Agent Domalewski, who had not even asked him to come to the FBI office, and had not asked him about the guns. Testimony with regard to this statement made by defendant Freeman was proper and could not furnish any grounds for an objection, or exclusion of such testimony. The jury would have had this testimony before them, in any event, without the necessity of the court's admonition not to consider the mention of the guns during the trial. The fact that under these foregoing circumstances the guns were discussed in the presence of the jury by Government counsel, and marked for identification, cannot support a conclusion that this constituted prejudicial and reversible error.

When a man is arrested on probable cause of committing a bank robbery by means of a gun, and the arresting officers find in his room, when they come to arrest him, two loaded guns of high caliber on a dresser near at hand, is such evidence admissible for any purpose on the trial of the man for bank robbery? See Banning v. United States, 130 F.2d

330 (C.C.A.6). We need not here consider the problem, for the trial court removed the entire matter from the consideration of the jury by telling them in clear, unmistakable, and concise terms that they were not to consider this matter in any way whatsoever.

■ Defendant Freeman contends that the trial court committed reversible error in not allowing him to have, for purposes of cross-examination, a photograph of a man which witness Frank Maruna had been shown by the FBI, and which he had selected as resembling Freeman. Mr. Maruna stated three weeks after the robbery that the man he saw sitting in the red Corvair getaway car in front of the bank resembled one Edward Grimm, as pictured in a photograph shown to him by the FBI. The Government objected to the production of the photograph of Edward Grimm and the trial court sustained the objection.

Defendant Freeman was not identified as one of the bank holdup men by reason of the photograph of Edward Grimm, and the photograph played no part in the identification process. In fact, it was to the advantage of defendant Freeman that Mr. Maruna had selected the photograph of another man, stating that it resembled Freeman.

In Simmons et al. v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, the Court had occasion to discuss the question of extra-judicial identification of accused persons through the use of exhibiting photographs by the police of such persons to prospective witnesses; and the Court held that whether such identification procedure was so unduly prejudicial as fatally to taint the conviction, must be evaluated in the light of the totality of the surrounding circumstances, and that a conviction based on eyewitness identification by a photograph would be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The Court, in arriving at the foregoing conclusion, mentioned some of the dangers to be guarded against, such as showing by the police, to a witness, a picture of a single individual who generally resembled the person he saw; or if they showed him the picture of several persons among which the photograph of a single such individual recurred, or was in some way emphasized; or if the police indicated to the witness that they had other evidence that one of the persons pictured committed a crime. The Court said: "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." All of the foregoing applies to a situation contrary to that appearing in the instant case. Here the witness Maruna had selected, a few weeks after the robbery, a photograph of a man who was not implicated in the crime, as "resembling" one of the robbers he saw. Nevertheless, on the trial Mr. Maruna positively identified the robber he actually saw at the bank just before the robbery, as being defendant Freeman. The Supreme Court, in the Simmons case, supra, also stated that although the defense "surely knew that photographs had played a role in the identification process," there was no attempt made to have the pictures produced prior to trial, pursuant to Rule 16 of the Federal Rules of Criminal Procedure. But, in any event, this is not a case where the defendant was prejudiced in having a witness identify the accused from a photograph before an identification on the trial. We find no error in the action of the trial court in sustaining the Government's objection to the production of the photograph of another man simply because the witness had stated that such photograph had resembled the defendant, whom he, nevertheless, positively identified on the trial.

It was not error to deny the defense motion to exclude all evidence as to the money found in defendant Freeman's possession at the time of his arrest. This money was reported by Special Agent Domalewski as having been on the dresser,

with the two loaded guns, when Freeman was being arrested in his bedroom. Freeman, without being asked, gave an explanation of the money by saying that he had received it that morning from an attorney in payment of his claim of damages arising out of an automobile accident.

The Special Agent paid no further attention to the matter, evidently accepting the explanation or not being interested in this money aspect of the investigation; and he, accordingly, left the money with Freeman and his wife.

 Freeman did not take the stand to testify as to where this rather large sum of money came from, nor did any lawyer testify as to having paid over to Freeman this amount as representing the settlement of a claim of damages in an automobile accident damage case. The day before the robbery Freeman was in such financial distress that he had to call a friend by long distance to have his television pawned in order to get fifty dollars. There was no evidence as to where this large sum of money, which was found in the possession of a man arrested as a bank robber, had come from. No name of any lawyer was ever mentioned as having paid over the sum of $780.00—an unusually large amount to be paid in cash—to Freeman in settlement of a damage claim. Under the circumstances, it was not reversible error for the trial court to deny the defense motion to exclude all reference to the money in question. Defendant attacks Mr. Maruna's identification of Freeman on the ground that when he first described him to police, he stated he had a dark complexion, while, on the trial, he described Freeman, whom he saw in court, as being of a very light complexion. It is to be said that when Mr. Maruna first saw defendant Freeman, the latter was sitting in an automobile wearing a straw hat, which might account for the fact that he thought he was of a dark complexion. However, he looked directly at Freeman from a distance of only a few feet just before the robbery and positively identified him at the time of the trial,

agreeing with counsel that Freeman was actually of a very light complexion. The court was not bound to exclude Mr. Maruna's testimony because of this contradiction and the jury could consider this incongruity in weighing Mr. Maruna's testimony. Furthermore, it is to be said that Mr. Maruna's recollection of the license plates on the getaway car was faulty, as heretofore mentioned. He could have given only a momentary glance at the plates and stated they had six digits, whereas they had two letters and four digits.

It was for the jury to accord the weight they felt proper to Mr. Maruna's testimony.

It also remains to be mentioned how it was so completely and positively proved that defendant Peacock and defendant Freeman were together the day before the robbery, during that night and the next morning. Peacock's girl friend made the trip with both of them from Louisville to Cleveland the day before the robbery. She testified without contradiction that they all spent the night together in the same motel room just before the robbery on the outskirts of Cleveland. On the next morning, the day of the robbery, she and the two defendants got into Peacock's car and went to a restaurant for breakfast, and they all had breakfast together. After breakfast Peacock and his girl friend got into the car and he drove her to a train station where he let her out of the car, and told her to wait for him. When Peacock and his girl friend left the restaurant that morning, Freeman stayed there. When the girl got out of the car she first sat on one of the nearby benches, than wandered about the place, looking into the window of a jewelry store, and she then went across the street to buy a magazine. Afterward, she walked back to the train station and waited for an hour and a half, or two hours, until Peacock returned and she got into the car with him. She did not see Freeman after she left the restaurant that morning about 10 A.M. After Peacock returned to get her at the train

station, they drove back to Louisville without Freeman.

Freeman had told Special Agent Domalewski that, although he drove to Cleveland with Peacock the day before the bank robbery, he had not stayed overnight with him. The girl's uncontradicted testimony demolished Freeman's claim and placed him with Peacock during the night preceding the robbery and on the morning of the robbery just outside Cleveland, Ohio.

Where the $18,000, stolen from the bank, was taken, no one knows as far as disclosed by the evidence. As to where Freeman went after the robbery, there is no evidence, but it is clear that the girl was driven to the train station by Peacock and left there a couple of hours while the bank robbery was being carried out by Peacock and Freeman. From everything that appears, the girl was completely innocent of any knowledge of the bank robbery or any knowledge that Peacock or Freeman were engaged in a criminal enterprise.

On the whole, the investigation of the bank robbery, the tracing of the getaway car, and the accumulation of the evidence over a long period of time, which finally led to the arrest and conviction of Peacock and Freeman constituted one of those unsung exploits of intelligence, perseverance, and detective skill that are so infrequently appreciated and so often carried through to a successful conclusion by the Federal Bureau of Investigation.

We have reviewed other contentions made during the trial and in the briefs on appeal, and find them unnecessary to consider.

In accordance with the foregoing, the judgment of the District Court is affirmed.

EDWARDS, Circuit Judge (concurring).

I concur in Judge McAllister's opinion, including the holding therein that no prejudicial error resulted from the offer in evidence of the loaded guns seized at the time of arrest of defendant Freeman.

This holding, however, I would relate to the admissibility of such testimony as bearing on the state of mind of the accused. Banning v. United States, 130 F. 2d 330 (6th Cir. 1942), cert. denied, 317 U.S. 695, 63 S.Ct. 434, 87 L.Ed. 556 (1943); Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); Hall v. People, 39 Mich. 717 (1878); 2 JONES ON EVIDENCE § 386 (5th ed., Gard rev. 1958).