UNITED STATES of America

v.

William Edward ZEILER and Richard Peter Chiocca.

Crim. No. 67–187.

United States District Court
W. D. Pennsylvania.

Feb. 19, 1969.

See also, D.C., 278 F.Supp. 112.

Gustave Diamond, U. S. Atty., by Stanley W. Greenfield, First Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

James P. McKenna, Jr., Pittsburgh, Pa., for defendant, William Edward Zeiler.

## OPINION AND ORDER

MARSH, District Judge.

On June 7, 1968, William E. Zeiler and Richard P. Chiocca were convicted by a jury on two counts of an indictment charging them with robbery of the Pittsburgh National Bank, Carrick Office, in the course of which lives were put in jeopardy by use of a pistol. Title 18. U.S.C. § 2113(a) and (d). Chiocca was sentenced; his motion for a new trial was withdrawn. The defendant Zeiler filed a motion in arrest of judgment, for a new trial or for judgment of acquittal. We think the motion should be denied.

On August 24, 1964, the Pittsburgh National Bank, Carrick Office, was robbed of $15,040. According to the testimony of the bank employees, a lone male, undisguised and unmasked, entered the bank at about 2:20 o'clock P. M. and walked to teller window No. 3, manned by Lois Reinhardt. There he requested that she change three one-dollar bills into dimes. As she attempted to comply, he placed a hand-printed note on her counter, the contents of which threatened her

life;[1] he gave her a brown paper bag and ordered her to fill it with money, he had a pistol in the palm of his hand which the teller saw. Obediently, Mrs. Reinhardt obtained money from her cash drawer and put it in the bag. He then gave the bag to teller Dorothy Reusche at window No. 2, who was aware of the robbery, and he said, "you too". He pointed the pistol at Mrs. Reusche when she hesitated in unlocking the lower drawer under the counter. He said: "This is your last chance." Then Mrs. Reusche put the money contained in all her drawers into the bag. The robber remained on the customer side of the counter. He was observed by Belle Gray, a bank employee, who had been attracted to him by "a look of like pure hatred" which he gave her as she passed behind Mrs. Reinhardt on her way to her desk on the other side of the bank. After teller Reusche handed him the bag, the robber departed through the front door, turning to the right as he reached the street. Then Mrs. Reusche screamed "we have been held up!", and Mr. Collins, the bank manager, rushed out of the bank in pursuit of the robber.

At that time, Charles E. Metzger was standing on the sidewalk in front of a drug store near a corner of the shopping center in which the bank is located. He heard someone running and, upon looking up, saw a man, whom he later identified as Zeiler, running towards him with what appeared to be a brief case under his arm. The runner passed within two feet of Metzger and went around the corner. When Collins approached, he asked Metzger, "did you see that man?", and Metzger replied, "yes, there was a man just run around the corner. He was getting into his car." Collins and Metzger went to the corner and observed the robber getting into a light green 1954 Plymouth automobile in the parking lot. Both men observed that there was affixed to the car a white license plate resembling a temporary registration plate issued in

Pennsylvania by dealers to purchasers of automobiles pending delivery of the permanent plate. The car was hastily driven over the curb into Parkfield Street, turned to the right, and then was driven out of sight. Shortly thereafter this car was found abandoned by the police about two miles from the bank.

Investigation revealed that this automobile was purchased by the defendant Chiocca from Kilgore Auto Sales in the early afternoon of the day of the robbery. Chiocca's fingerprints were found on the documents used to transfer title and register the vehicle. A white temporary license plate was affixed to the car.

Zeiler's first argument in support of his motion is that he "WAS PREJUDICED IN BEING TRIED JOINTLY WITH A CO-DEFENDANT WHERE THE CO-DEFENDANT HAD MADE ADMISSIONS INCRIMINATING DEFENDANT ZEILER." In our opinion, the codefendant, Chiocca, did not make admissions incriminating Zeiler. He did make self-incriminating admissions to the effect that he supplied the car for this robbery and divulged what he did with the money which he received as his share. Mrs. Ruth A. Stephens, Chiocca's paramour, testified to what she heard Chiocca tell their attorney before he gave himself up. The critical part of her testimony is as follows:

"A Then Mr. Schuchert asked Mr. Chiocca how and when they would get in touch with one another as far as this bank robbery was concerned, and Mr. Chiocca said that this person would call a few days before and a few days after the bank robbery. Mr. Schuchert also asked did he supply the car for this bank robbery, and Mr. Chiocca said that he did. Also, Mr. Schuchert asked him what sum of money he had gotten, but I don't remember this answer.

"Q Now, did Mr. Chiocca make any comment at this time about the pro-

1. The note read:
"BE QUICK! BE QUIET! OR YOUR'E DEAD!! FILL BAG WITH LARGE BILLS *QUICKLY!! QUIETLY!!* OR YOU AND OTHERS WILL BE DEAD!!"

ceeds or the money obtained in the so-called robbery about which he was talking? Did he made any comment about what he did with it or where he put it?

"A Yes, I remember that he said that he had hidden it in the rafters of his house in the basement and also in a metal box that he had welded to the frame of his car."

On May 28, 1968, at trial, Zeiler made an oral motion for severance, citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), decided on May 20th. The Government assured the court that Mrs. Stephens' testimony would be "sanitized", and that it would contain no reference to codefendant Zeiler.[2] At the trial, when the Government made an offer to prove Chiocca's admission through Mrs. Stephens, Zeiler objected, again citing Bruton. The objection was overruled. In our opinion, the sum and substance of Mrs. Stephens' testimony was innocuous with reference to Zeiler; it did not implicate Zeiler; it did not violate Zeiler's right of cross-examination secured by the confrontation clause of the Sixth Amendment. Her testimony does not even mention the bank robber. It relates only to Chiocca's participation in aiding and abetting the robbery.[3] There was no direct or indirect declaration that Zeiler was the robber.

The facts here differ materially from the facts in Bruton. There the incriminated defendant was denied his constitutional right to impugn through cross-examination the source of testimony implicating him. Here, the defendant Zeiler was not incriminated by name or otherwise. In Bruton there was hearsay evidence which was inadmissible against the codefendant. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). Here, hearsay evidence implicating Zeiler was absent.

Chiocca admitted only to facts incriminating himself, i. e., that he supplied the car for the robbery, that he would receive a call from "a person" a few days before and a few days after the bank robbery, and that he concealed the money obtained from the robbery. He did not mention or say that he knew the identity of the actual robber. The substance of Mrs. Stephens' testimony did not resemble in the least the "powerfully incriminating extrajudicial statements" found in Bruton.

Zeiler's conviction is bottomed on direct evidence of his own acts in the bank and his get-away in the green Plymouth; the in-court identification of him by three bank employees and by Mr. Metzger; the fact that he was acquainted with Chiocca; and the testimony of the handwriting expert that the hold-up note was "most probably" written by Zeiler.

Zeiler's complaint of prejudice is without substantial basis in fact. As we see it, a joint trial with a codefendant who has made an extrajudicial confession of guilt implicating only himself is less likely to engender harm than being named as the accused in the indictment or being identified by name as a defendant in the presence of jurors on the voir dire. In the circumstances here, if the defendant's insistence on prejudice were to prevail, it would likely result in a prohibition of all joint criminal trials of two accused persons where one has extrajudicially confessed, and, perhaps, of all joint trials of multiple defendants where one or more has extrajudicially confessed, with all the injurious consequences resulting from delay, congestion, and "varying consequences for legally indistinguishable defendants" (dissent in Bruton, supra). We do not think Bruton requires such a result.

■ If there was error arising from the denial of defendant's motion to sever, or in overruling his objection to Mrs.

---

2. Excerpts of Proceedings from trial, pp. 2–9.

3. It was not a prerequisite to the conviction of Chiocca, the aider and abettor, that the actual robber be identified. United States v. Provenzano, 334 F.2d 678 (3d Cir. 1964).

Stephens' testimony, in our opinion it was harmless beyond a reasonable doubt, for it contained no probative evidence that Zeiler was the actual bank robber. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Zeiler also argues that: "THE IDENTIFICATION TESTIMONY WAS SO TAINTED THAT IT SHOULD HAVE BEEN STRICKEN FROM THE RECORD AND NOT HAVE BEEN CONSIDERED BY THE JURY IN ITS DELIBERATION."

Zeiler was arrested on June 23, 1967; experienced counsel was appointed for him on June 26th; he was indicted on August 1, 1967. His arrest was attended by considerable publicity. See: United States v. Zeiler, 278 F.Supp. 112 (W. D.Pa.1968). All the identification witnesses were aware of that publicity and saw the newspaper and televised pictures of the arrested defendant and read and heard the news accounts.

It appears that Mrs. Reusche identified the defendant from the publicity pictures, and Mrs. Gray affirmatively did not. It does not appear whether Mrs. Reinhardt and Mr. Metzger did or did not make an identification from the publicity pictures.

On June 29th or 30th, in absence of his counsel, all the identification witnesses, separately and without opportunity to consult, were shown eight photographs (Exs. A through H), five of them (Exs. D through H) were dual pictures of men showing full face and profile;[4] three of the photographs (Exs. A, B, C) were single pictures of Zeiler which bore no markings on either the faces or backs thereof. Mrs. Reusche, Mrs. Gray and Mr. Metzger identified defendant from the photographs as the man they had seen in or near the bank at the time of the robbery.

Defendant contends that this pretrial identification was tainted. We think it was an extremely unwise procedure to have shown photographs of an accused suspect to identification witnesses after he had been arrested, especially in absence of his appointed counsel.[5] However, at the trial, which was held over ten months later (another trial of Zeiler having intervened[6]), the facts concerning the publicity pictures of the arrest and the photographic identifications were fully brought out on direct and cross-examination. The defendant's counsel, aware of all the facts and circumstances, expertly but unsuccessfully attempted to discredit the in-court identifications. He had no difficulty in depicting what had transpired during the publicity and at the showing of the photographs; and he presented for jury scrutiny all the elements of unfairness and unreliability.

The inherent risks of suggestion which lurked in viewing the photographs (Exs. A through H) were not as great and indeed were much less than the hazards involved in viewing the unavoidable television and newspaper pictures, already seen four days prior thereto by all the identification witnesses, where the defendant was exhibited shackled and heralded as the long-sought "commuter bandit".

On July 6, 1967, an official lineup was held attended by defendant's counsel in strict conformity to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). All of the identification witnesses except Metzger were

---

4. On the obverse of these photographs, two disclosed police numbers, one a Department of Justice, United States Penitentiary number and a name, one an FBI number, and one a number; all but one photograph bore dates; all had data on the reverse.

5. It is understandable that the FBI, who since 1961 had been investigating 11 robberies thought to have been committed by the same man, would attempt to secure a consensus of identification from the more than 50 victims. See: United States v. Zeiler, supra, p. 113.

6. Zeiler was tried and convicted on January 23, 1968 of two other bank robberies. He had been indicted for ten robberies, two of which were dismissed on motion by the prosecution, and he was found not guilty of six.

present. All of them identified Zeiler at the lineup as the robber,—Mrs. Reinhardt stating that he resembled the robber.

Of course, all the witnesses knew from the extensive newspaper and television publicity that Zeiler had been arrested as the suspected "commuter bandit". They had been shown many photographs subsequent to the robbery without identifying the robber.[7] The bank employees had been shown composite sketches (Exs. J, I) of the robber made in 1963 and 1965, respectively, from information given by the many victims of prior robberies. Mrs. Reinhardt and Mrs. Gray thought Exhibit J, the composite sketch sent to banks in 1963 prior to the robbery, as well as Exhibit I, circulated in 1965, resembled the robber, except they believed that the robber, as they recalled him, was an older man. At the trial the defendant looked older than the man depicted in the composite sketches. Mrs. Reusche thought the sketches did not look like the robber.

Despite the alleged taints in the pretrial picture identification, a foundation for the in-court identifications was established at trial independently of the publicity pictures and the photographs viewed after the defendant's arrest and in absence of his counsel.[8] Cf. United States v. Hoffman, 385 F.2d 501 (7th Cir. 1967).

Mrs. Reinhardt testified that Zeiler resembled the robber. She testified that the distinctive feature of the robber were his eyes; she said Zeiler "has exactly the same eyes"; she said she paid no attention to the dates or writing on the photographs (Exs. D through H),— "I was looking at the faces". It does not appear that she identified Zeiler from

these photographs or the publicity pictures. At the lineup she selected Zeiler as the subject who resembled the robber.

Mrs. Reusche positively identified Zeiler as the robber. She said "this man's mouth stuck out and when I heard his voice, I was sure it was his voice." She was sure that the publicity pictures and the photographs (Exs. A, B, C) were those of the robber; she identified Zeiler at the lineup. She was certain that Zeiler's voice was that of the robber.

Mrs. Gray positively identified Zeiler as the man she saw at the teller's cage immediately prior to the alarm. She had been impressed by the look of hatred he had given her. She thought his eyes were his most impressive feature. She noted a resemblance to the robber on Exhibits A, B and C, but felt she wanted to see him in person before positively identifying anyone. She testified that she paid no attention to the markings on the photographs (Exs. D through H). At the lineup she immediately recognized Zeiler as the robber.

Mr. Metzger testified that the defendant bore a likeness to the man who ran toward and past him at the shopping center and who got into a light green Plymouth. He also thought the photographs (Exs. A, B, C) shown to him after the arrest bore a likeness to that man. He testified that he did not know what the markings on the photographs meant, and that they had no effect on the identification; that he did not pay much attention to the markings, but was just looking at the pictures of the men's faces. It does not appear that he identified defendant from the publicity pictures he had seen.

It is understandable that persons unfamiliar with police and prison tech-

---

7. Only one witness, Mrs. Reusche, had previously picked a photograph of a man named Bomer which she thought bore a close resemblance to the robber. Cf. United States v. Peacock, 400 F.2d 992, 1000 (6th Cir. 1968).

8. Applying the test prescribed in Wong Sun v. United States, 371 U.S. 471,

487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, the in-court identification testimony (of Reusche, Gray and Metzger) which defendant moved to strike, "has been come at * * * by means sufficiently distinguishable to be purged * * *'" of the allegedly tainted photographs, i. e., by an independent source in the robbery itself.

niques might not be prejudicially impressed by markings or absence of markings on photographs at which they are looking to identify a robber.

In our opinion, from the totality of the surrounding circumstances the procedure used by the FBI in showing the photographs (Exs. A through H) to the victims of the crime and to Metzger, after they had seen the publicity pictures of Zeiler, was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Cf.* Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L. Ed.2d 1247 (1968). If harm there was, it already had been accomplished by the publicity pictures with which the FBI and police had nothing to do.

All the witnesses, immediately after the robbery, had described the robber's general build and appearance. The bank employees were familiar with the composite sketch (Ex. J) in circulation since 1963. The evidence at trial convincingly showed that the in-court identification by all the witnesses had an independent origin arising from observation of the defendant at the time of the robbery. None of the witnesses appeared to have been affected by the allegedly tainted photographic identifications. The tellers observed the robber and his actions over a period of about five minutes. Nothing obstructed their view of the robber during this period. They were close to him. Mrs. Gray and Mr. Metzger, likewise, had unobstructed but much shorter periods of observation; they, too, were close to him; each gave an accurate description of his appearance; each had good reason to be particularly impressed by the circumstances and to remember his facial characteristics. None of the witnesses gave a description of the robber which was at variance with the defendant's actual appearance; none identified another person from the many photographs shown to them from time to time after the robbery;[9] all, except Metzger who did not attend, identified Zeiler from uninfluenced observation at the carefully conducted lineup in the presence of his counsel. The circumstances surrounding the other pretrial identifications in the aggregate were not so suggestive and conducive to irreparable misidentification as to deny the defendant due process of law. *Cf.* Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Palmer v. Peyton, 359 F.2d 199 (4th Cir. 1966). We believe that the foregoing facts as reflected by the record, disclose a sufficiently independent and uninfluenced source or origin in the robbery itself to stand as the basis for the in-court identifications. *Cf.* United States v. Hoffman, supra.

■ All the identification facts were put before the jury,—a protective process guaranteed by the Constitution.[10] In identification cases we think the fairest result is achieved by permitting juries to determine identity by fairly exposing them to the pertinent surrounding facts and circumstances as was done in this trial. *Cf.* Crime Control Act, Title 18 U.S.C.A. § 3502 (1968 supp.).[11]

An appropriate order will be entered.

9. See f. n. 7, supra.

10. The jury was instructed:
"If you believe that a witness' identification of the defendant Zeiler as the robber was a product of viewing photographs of him in combination with photographs of other persons, or from watching television pictures of him or from looking at newspaper pictures of him, shown to or viewed by that witness after the arrest of Mr. Zeiler in June, 1967, and that a witness' identification of Zeiler was not an independent recollection of the robber as she or he saw him at the time of the robbery, then you should disregard the testimony of such witness."

11. This section provides:
"The testimony of a witness that he saw the accused commit or participate in the commission of the crime for which the accused is being tried shall be admissible in evidence in a criminal prosecution in any trial court ordained and established under article III of the Constitution of the United States."