**UNITED STATES of America,**

v.

**William Edward ZEILER, Appellant.**

Nos. 72–1190, 72–1191.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Sept. 29, 1972.

Decided Dec. 14, 1972.

James P. McKenna, Jr., Dickie, Mc-Camey & Chilcote, Pittsburgh, Pa., for appellant.

Richard L. Thornburgh, U. S. Atty., Samuel J. Orr, III, Pittsburgh, Pa., for appellee.

Before STALEY, VAN DUSEN and MAX ROSENN, Circuit Judges.

OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

William Edward Zeiler appeals his convictions for three bank robberies after a jury trial in the United States District Court for the Western District of Pennsylvania. Three eight-and-one-half year sentences, to be served concurrently, were imposed. On this, his third appeal to this court, Zeiler challenges the competency of witnesses who identified him at the time of the trial as the perpetrator of one of the robberies because of their exposure to: (a) extensive pretrial publicity identifying him as the robber, and (b) photographs of him, seen in the absence of defense counsel. We reject both of these contentions and affirm the convictions.

Zeiler was originally arrested in June 1967 as a suspect in a series of bank robberies. Following a hearing at which he unsuccessfully attempted to suppress identification testimony because of the pretrial publicity, United States v. Zeiler, 278 F.Supp. 112 (W.D. Pa.1968), Zeiler was tried and convicted in two separate trials, one for the Carrick bank robbery, United States v. Zeiler, 296 F.Supp. 224 (W.D.Pa.1969), and one for the Oakland and Bloomfield bank robberies (unreported).

We considered appeals from both trials in United States v. Zeiler, 427 F. 2d 1305 (3d Cir. 1970), (*Zeiler I*). The Carrick robbery conviction was reversed because photograph displays shown to witnesses had been unduly suggestive. The Bloomfield and Oakland robbery convictions were also reversed, with instructions for the district court to determine before retrial whether photograph displays shown to the witnesses had

been unduly suggestive. After a hearing, the court suppressed all identifications in the Oakland and Bloomfield robberies. The Oakland robbery suppressions were not appealed, but we reversed the suppression of identifications by the Bloomfield witnesses in United States v. Zeiler, 447 F.2d 993 (3d Cir. 1971), (*Zeiler II*). Adhering to the rulings of this court, at the retrial now being appealed, the Government introduced no eyewitness identifications in connection with the Carrick and Oakland robberies. Witnesses to the Bloomfield robbery, however, did make in-court identifications of Zeiler.

The claim that the Bloomfield witnesses were incompetent to testify because of unduly suggestive photograph displays deserves little comment. In *Zeiler II*, we considered the precise issue now appealed. At that time we found an independent origin for in-court identifications. We see no reason to reverse our holding now. The court was careful upon retrial to restrict witnesses to in-court identifications and to exclude testimony about photograph display identifications. Our instructions were followed explicitly.[1]

Thus, the only real issue in this appeal is the nettlesome question of whether witnesses who have been exposed to extensive pretrial publicity identifying the defendant as the culprit should be disqualified from testifying as to the defendant's identity. We did not meet this issue in either *Zeiler I*, 427 F.2d at 1308 n.4, or *Zeiler II*, 447 F.2d at 996.

The district court refused to suppress eyewitness identifications because of pretrial publicity both at a suppression hearing, 278 F.Supp. 112 (1968), and on

motion for new trial after the Carrick bank robbery conviction, 296 F.Supp. 224, 227–229 (1969). We did not meet the pretrial publicity issue on the first appeal because we found the witnesses' testimony tainted by the photograph displays. *Zeiler I*, 427 F.2d 1305. We did not reach the publicity issue with respect to the Oakland and Bloomfield robberies in *Zeiler I* because there was inadequate evidence concerning identification procedures. In *Zeiler II* this court once again did not meet the publicity issue, although stating "we do not find the witness' in-court identifications to have been tainted by the publicity. . . . ." 447 F.2d at 996–997.

Confronted for the first time with the necessity of ruling on the pretrial publicity issue, we must review the facts. Following a five year series of bank robberies, Pittsburgh police mounted an extensive search for the "commuter bandit." Sketches of the robber were widely circulated. When Zeiler was arrested and brought into the Federal Building on June 23, 1967, press and television photographers were on hand. Pictures were taken both in the basement parking area and on the thirteenth floor. Zeiler's picture was shown on the three major television stations in Pittsburgh and appeared in both major newspapers. This publicity indicated that appellant was allegedly the elusive "commuter bandit."

Appellant contends that the prosecuting authorities encouraged and assisted the news media. He notes that cameramen were waiting at the Federal Building when he arrived in official custody. He testified at trial that one of the offi-

---

1. The distinction between in-court identifications and at-trial testimony about prior photograph identifications was necessary because of our holding in Zeiler I, 427 F.2d at 1307–1308. There we applied the per se rule of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)—barring testimony about line-up identifications held without counsel—to at-trial testimony about prior identifications at photograph displays held without counsel. We further noted, however, that in-court identifications were permissible under *Wade* if the Government established by "clear and convincing evidence" that the witnesses were not influenced by the prior identifications. We reversed our holding in Zeiler I in United States ex rel. Reed v. Anderson, 461 F.2d 739 (3rd Cir. 1972), but we need not consider the effect of that reversal on the present case because witnesses were limited at the Bloomfield robbery retrial to in-court identifications.

cials leading him into the Federal Building said to the photographers:

> Hey, let's give these other guys a chance here. Let's slow up a little bit and let them get a good picture—give them a chance. . . . They have to make a living, too.

Three of the four witnesses to the Bloomfield robbery saw pictures of Zeiler's arrest on television and in the newspapers; the fourth saw the arrest on television alone. All four witnesses testified at the suppression hearing that upon seeing Zeiler's picture they knew this was the man they had seen robbing the Bloomfield bank. The four witnesses discussed the news reports among themselves prior to viewing Zeiler in a photograph display and at a line-up.

The competency of the eyewitness identifications is challenged on two grounds: (1) federal and local officials aided the news media in publicizing photographs of the arrest and (2) the media viewings made the witness identifications inherently suspect.

Appellant's first ground can be easily dismissed. We need not decide whether encouragement by law enforcement officers of prejudicial pretrial publicity should disqualify witnesses affected by such publicity, for the record does not support the defendant's factual allegations. No evidence was presented that the pretrial publicity was controlled or directed by law enforcement authorities. Nor was there evidence that the arrest publicity was designed by them as a pre-line-up identification technique. Nothing in the record indicates that law enforcement authorities had set up a "meet the press" conference with Zeiler.[2] The foregoing statement reputedly made by a Pittsburgh police official, even if true, is of little significance. The appellant has not shown that the publicity surrounding the arrest of the "commuter bandit" was anything more than normal news coverage, rather than the product of law enforcement officials trying to make a case in the newspapers or on television.

Appellant's second ground is more troublesome. His claim combines elements of two separate lines of precedent, each concerned with protecting the integrity of the criminal proceeding as a fact finding mechanism. While conceding that no reported decision has ever declared eyewitness identifications incompetent because of pretrial publicity, defendant analogizes the effect of publicity on witnesses with its effect on jurors. He points to the Supreme Court's conclusions that a fair trial can be denied because of the prejudicial psychological impact, either of pretrial publicity on jurors, Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), or of televised judicial proceedings on in-court participants, Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). And, he raises a problem analogous to those considered in the Supreme Court decisions on line-up and photograph display identifications.

■ Cases involving the psychological impact of pretrial publicity upon jurors, however, are not really apposite. The constitution guarantees an impartial jury. It does not guarantee an impartial witness. A juror must impartially analyze and weigh evidence presented at trial; he should not consider extra-judicial information about an alleged criminal act. A witness, on the other hand, is not charged with weighing the testimony and ascertaining guilt or innocence. He brings to the courtroom information related to the alleged crime. Of necessity, he lacks the detachment required of jurors.

Biased jurors can be weeded out on voir dire, or if necessary, by a change of venue. They can be replaced with neu-

---

2. In fact, Federal Department of Justice regulations discourage pretrial pictures of suspects. It is Department policy that its personnel:

> should take no action to encourage or assist news media in photographing or

televising a defendant or accused person being held or transported in federal custody.

tral jurors. Witnesses are not so fungible. Disqualification of jurors because of exposure to pretrial publicity does not prevent trying a defendant; disqualification of witnesses may have that effect. We long ago abandoned the practice of disqualifying witnesses because of presumed bias. Bias can be examined through cross-examination, and juries are free to disregard biased testimony. The same standards cannot be applied to both jurors and witnesses vis-a-vis pretrial publicity.

The other line of precedents upon which appellant relies stems from cases such as United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), in which the Supreme Court carefully scrutinized pretrial identification procedures to prevent police and prosecuting officials from using unduly suggestive techniques presenting a high risk of misidentification. Both Wade and Simmons were concerned with the conduct of law enforcement officials in unfairly influencing identifications. While there is a risk that newspaper and television photographs of the defendant, labeled as pictures of the suspect, will

unduly influence eyewitnesses, the publication of Zeiler's photograph in the present case cannot be attributed to law enforcement officials. To sustain appellant's contention that eyewitness identification testimony is inadmissible because of the pretrial publicity would impose on law enforcement officials an affirmative duty to prevent the press from publishing photographs of arrested suspects. Such a holding would raise serious first amendment problems, and we decline to make it.

■ When, as in the present case, there is no evidence that law enforcement officials encouraged or assisted in impermissive identification procedures, the proper means of testing eyewitness testimony is through cross-examination.[3] The credibility of witnesses' subsequent identifications can be weighed by the jury in light of the witnesses' statements as to their reactions to television or newspaper pictures. The danger that the jury may give undue weight to eyewitnesses' testimony can be further guarded against by appropriate jury instructions.[4]

The judgment of the district court will be affirmed.

3. In the present case, no reference by either party to the witnesses' media viewings was made at trial, either on direct or cross-examination. The trial judge would not permit the Government to introduce evidence about the photograph or line-up identifications. Counsel for the defendant was not prevented from cross-examining the witnesses about the line-up, the photograph display or the media viewings. Had defense counsel wished to attack the credibility of the in-court identifications on the basis of these previous identifications, he could have done so.

4. In United States v. Barber, 442 F.2d 517, 528 (3d Cir. 1971), we approved the Pennsylvania approach on jury instructions on identification and required that prospective instructions satisfy the following:

In any case raising the question whether the defendant was in fact the criminal actor, the jury will be instructed to resolve any conflict or uncertainty on the issue of identification. The jury will be instructed that identification may

be made through the perception of any of the witness' senses, and that it is not essential that the witness himself be free from doubt as to the correctness of his opinion. The identification testimony may be treated by the jury as a statement of fact by the witness: (1) if the witness had the opportunity to observe the accused; (2) if the witness is positive in his identification; (3) if the witness' identification testimony is not weakened by prior failure to identify or by prior inconsistent identification; and (4) if, after cross-examination, his testimony remains positive and unqualified. In the absence of any one of these four conditions, however, the jury will be admonished by the court that the witness' testimony as to identity must be received with caution and scrutinized with care. The burden of proof on the prosecution extends to every element of the crime charged, including the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime for which he stands charged.