Hillsborough-northern judicial district
No. 2009-048

# The State of New Hampshire

v.

# Michael Addison

Argued: July 14, 2010
Opinion Issued: October 19, 2010

*Michael A. Delaney*, attorney general (*Peter Hinckley*, assistant attorney general, & a., on the brief, and *Mr. Hinckley* orally), for the State.

*Richard Guerriero*, public defender, of Concord, and *David M. Rothstein*, deputy chief appellate defender, of Concord, on the brief, and *Mr. Guerriero* orally, for the defendant.

HICKS, J. The defendant, Michael Addison, appeals his convictions for armed robbery and being a felon in possession of a weapon. *See* RSA 636:1 (2007); RSA 159:3 (2002). On appeal, he argues that the Superior Court (*McGuire*, J.) erred by: (1) denying his motions to continue; (2) refusing to give cross-racial identification jury instructions; (3) informing the venire that he was charged with the murder of a police officer, *see State v. Addison*, 159 N.H. 87 (2009); and (4) denying his motion to suppress an in-court identification. We affirm.

The following facts are not in dispute or are supported by the record. On October 10, 2006, two armed men entered El Mexicano restaurant in Manchester while a third waited in a car. The first man, later identified as Antoine Bell-Rogers, carrying a handgun, went into the kitchen of the restaurant where owner José Rodriguez and his wife, Patricia Deleon, were preparing food. He fired two shots and demanded that Rodriguez hand over the jewelry he was wearing. At the same time, the second man, wielding a knife, robbed a customer, Alexander Paz, taking his money, keys, cell phone and cigarettes.

Shortly after the robbers fled, Manchester police arrived at the scene and interviewed Rodriguez, Paz, Deleon and another witness. All provided different descriptions of the assailants. Each of the witnesses has limited English proficiency and speaks Spanish as his or her native language.

After the robbery, Detective John Patti compiled two photo arrays, selecting photos that matched the descriptions given by the witnesses. He placed the defendant's photo in the second array, in the top row of four, third from the left.

Later that day, Patti and Officer Timothy Feliciano, a native Spanish-speaker, presented the photo arrays to Rodriguez and Deleon. The officers separated Rodriguez from the other witnesses, so that only he could hear the instructions and see the photo arrays. Feliciano translated the "Photo Line-up Witness Instructions" form from English to Spanish for Rodriguez. The instructions provided: "This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. . . . You do not have to identify anyone. . . . You must make up your own mind and not be influenced by other witnesses, if any." Rodriguez acknowledged that he understood the instructions.

Initially, Rodriguez was not able to make any identification from either photo array. During a second look, however, he identified the gunman as Bell-Rogers, but did not identify the defendant. Later the same evening, Patti and Feliciano presented the photo arrays to Paz at his home. He identified the defendant.

At trial, Rodriguez testified that on the day of the robbery he went to the front counter to take an order from a new male customer. When Rodriguez went back to the kitchen, Bell-Rogers followed him and robbed him at gunpoint. Rodriguez testified that the defendant was the man at the front counter. Paz testified that he was sitting at a table near the counter when he saw two black men enter the restaurant. While he was being robbed by one of the men, the other man went into the kitchen. He identified the defendant as the man who robbed him.

Jeff Hayes was the driver of the getaway car. Hayes wanted to rob El Mexicano restaurant because he knew that the owner wore a large expensive bracelet. At trial, Hayes testified that he, Bell-Rogers and the defendant committed the robbery together.

*I. Motion to Continue*

Prior to trial, the defendant moved to continue the trial, arguing that a last minute disclosure of evidence about Hayes, including his medical and criminal records and his plea agreement, prejudiced the defense. Following a hearing, the trial court denied his motion, reasoning that: "You may have

more discovery to do but you've got ample time to do it in. We don't pick a jury until a week from Tuesday." On the first day of trial, the defendant again moved to continue, arguing that he had not been able to adequately prepare in light of new statements made by Rodriguez, Deleon and Paz in the days immediately preceding trial. The trial court again denied his motion, reasoning that the new statements gave the defense "plenty of fodder for cross-examination."

On appeal, the defendant argues that the denial of a continuance was an unsustainable exercise of discretion that violated his right to due process. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV. He argues that: (1) a conviction in this case would ultimately be used to seek the death penalty in a later case; (2) there had been no prior continuances; and (3) the need for a continuance arose from the State's last minute production of evidence. He asserts, therefore, that the trial court acted unreasonably in denying his motions. Both parties agree that our standard of review is whether the trial court committed an unsustainable exercise of discretion. Accordingly, we assume, without deciding, that this is the correct standard.

We first address the defendant's claim under the State Constitution and cite federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court. *State v. Hood*, 127 N.H. 478, 481 (1985). We will not overturn that decision unless it is an unsustainable exercise of discretion. *Id.*; *see State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

"There are no mechanical tests to determine when due process has been violated by the denial of a continuance, but in each case the totality of the circumstances must be considered." *State v. Linsky*, 117 N.H. 866, 880 (1977); *see State v. Barham*, 126 N.H. 631, 640 (1985); *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process."). We consider the facts as they were presented to the court at the time of the ruling. *State v. MacLeod*, 119 N.H. 480, 482 (1979); *see Ungar*, 376 U.S. at 589 ("The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.").

Under these circumstances, we find no unsustainable exercise of discretion in the denial of the continuances. The documents received pertained to previous prosecutions against Hayes, his plea agreement and

his medical records. The defendant had eleven days to examine the new discovery and to prepare for trial. Immediately preceding trial, Rodriguez and Deleon were deposed.

The Federal Constitution offers the defendant no greater protection than the State Constitution with regard to his claims of error. *See Linsky,* 117 N.H. at 880; *Ungar,* 376 U.S. at 589. Accordingly, we reach the same result under the Federal Constitution.

## II. Cross-Racial Jury Instruction

Because the victims in this case were Hispanic and the robbers were African-American, the defendant requested a cross-racial jury instruction, citing the differences in accuracy between same-race identification and cross-racial identification. The trial court denied his request, reasoning that its instructions adequately addressed the defendant's concerns. The defendant argues that the trial court unsustainably exercised its discretion because "identification was the central issue and Rodriguez's identification was suspect."

■ Whether or not a particular jury instruction is necessary, and the scope and wording of the instruction, are within the sound discretion of the trial court. *State v. Kousounadis,* 159 N.H. 413, 422-23 (2009). We review the trial court's decision for an unsustainable exercise of discretion. *Id.* at 423. To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case. *State v. Deschenes,* 156 N.H. 71, 82 (2007).

The trial court gave the jury the following instruction on identification:

> One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The State has the burden of proving identity beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him.

> If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

> Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness

had to observe the person who committed the crime at the time of the crime, and to make a reliable identification later. In appraising the identification testimony of a witness, you should consider the following: one, are you convinced that the [witness] had the capacity and an adequate opportunity to observe the person who committed the crime? Whether the witness had an adequate opportunity to observe at the time of the crime will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were the lighting conditions, and whether the witness had occasion to see or know the person in the past. Two, are you satisfied that the identification made by the witness after the crime was the product of his own recollection? You may take into account both the strength of the identification and the circumstances under which the identification was made. If the identification by the witness may have been influenced by the circumstances . . . under which the defendant was presented to him for identification, you should scrutinize the identification with great care.

You may also consider the length of time that elapsed between the occurrence of the crime and the next opportunity of the witness to see the defendant as a factor bearing on the reliability of the identification. You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witnesses. Three, you may take into account any occasion in which the witness failed to make an identification of the defendant or made an identification which was inconsistent with his identification at trial. Four, finally, you must consider the credibility of each identification witness in the same way as any other witness. Consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony.

I again emphasize the burden of — that the burden of proof is on the State. Now, I did emphasize the burden of proof on the State extends to every element of the crime charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged.

If, after examining the testimony, you have a reasonable doubt as to the accuracy of the identification of the defendant, you must find him not guilty.

■ The trial court acted within its discretion by declining to give the cross-racial instruction. The identification jury instruction provided ample guidance to the jury on how to properly assess the identification testimony. We find that the court sufficiently charged the jury on identification.

### III. VandeBogart Instruction

On the first day of jury selection, the trial judge began the proceedings by telling the prospective jurors about the charges. She stated: "This morning we will be choosing a jury for the case of *The State of New Hampshire v. Michael Addison*. Mr. Addison is charged with armed robbery and being a felon in possession of a deadly weapon." Over the defendant's objection, the court then gave the following instruction, based upon an instruction given in *State v. VandeBogart*, 136 N.H. 107, 113-15 (1992):

I will be candid with you and inform you that the defendant in this case . . . has been indicted in the shooting death of Manchester Police Officer Michael Briggs in October 2006. That case has not yet been tried and the defendant's guilt or innocence in that case has not been determined.

However, the defendant is presumed innocent of that charge, as he is in the present charges, unless and until the State proves his guilt beyond a reasonable doubt. The Briggs[ ] case is totally unrelated to the present charges and has nothing to do with the defendant's guilt or innocence on these charges.

The reason I mention the Officer Briggs[ ] case is that it has garnered much publicity in local newspapers and in local radio and television broadcasts. I assume most of you have read or heard or seen something about that case, or the charges presently before the Court. The fact that you may have read, heard or seen something about the present charges or the shooting death of Officer Briggs does not in and of itself disqualify you from serving as jurors on this case.

To be a fair and impartial juror does not mean that you must come into the trial with no information or impression about the

defendant or the case. To be a fair and impartial juror it is sufficient if you can lay aside your preconceptions, biases or opinions and render a verdict based on the evidence presented in this court during this trial.

I have been candid with you and it is imperative that you be candid with me. If you feel that you cannot put aside any impressions, opinions or biases you may have of this case or this defendant, you must tell me that.

The court then proceeded with *voir dire*, empanelling a jury.

On appeal, relying upon Part I, Articles 15, 17, and 35 of the State Constitution and the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitution, the defendant contends that the *VandeBogart* instruction violated his state and federal constitutional rights to a fair trial before an impartial jury. *See* N.H. CONST. pt. I, arts. 15, 17, 35; U.S. CONST. amends. V, VI, XIV. He asserts that these alleged errors entitle him to a new trial.

The defendant argues that the trial court erred by giving the *VandeBogart* instruction to the venire because the facts and circumstances in *VandeBogart* differed from those in this case and because *VandeBogart* was based upon flawed reasoning. We disagree.

The defendant raises essentially the same arguments as he did in *State v. Addison*, 160 N.H. 493 (2010), in which the trial court gave a nearly identical *VandeBogart* instruction. For the reasons stated in that decision, we find no error.

## IV. In-Court Identification

The defendant asserts that the trial court erred in allowing Rodriguez's in-court identification and his testimony about the photo line-up. The defendant asserts that Rodriguez's identification and testimony were unreliable, and alleges that the admission of this evidence violated his state and federal due process rights. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. XIV. He further alleges a violation of Rule 403 of the New Hampshire Rules of Evidence. In support, he argues that: (1) Rodriguez did not identify the defendant five days after the robbery, but testified to the contrary at trial at variance with the testimony of two police officers; (2) Rodriguez's description of the suspect was inconsistent with Paz's; and (3) Rodriguez's identification of the defendant was influenced by media exposure, his wife and Paz.

We address the defendant's claim under the State Constitution and cite federal opinions for guidance only. *Ball*, 124 N.H. at 231-33. The

defendant argues that "[t]he admissibility of identification evidence over a due process objection is governed by" the *Biggers* test. *See Neil v. Biggers*, 409 U.S. 188 (1972). The *Biggers* test requires a two-step analysis. *State v. King*, 156 N.H. 371, 373-74 (2007). In *King*, we articulated the analysis as follows:

> Initially, we inquire into whether the identification procedure was impermissibly or unnecessarily suggestive. At this stage of the inquiry, the defendant has the burden of proof. Only if the defendant has met his burden must we then consider the factors enumerated in *Neil v. Biggers* . . . to determine whether the identification procedure was so suggestive as to render the identification unreliable and, hence, inadmissible. At this stage of the inquiry, the State bears the burden.

*Id.* at 374 (quotation omitted). The trial court did not perform a *Biggers* analysis because it ruled that "[i]f state action does not cause a suggestive encounter, the *Biggers* factors are not relevant to the admissibility of an identification."

The defendant claims that the trial court erred in light of *United States v. Bouthot*, 878 F.2d 1506 (1st Cir. 1989), and *United States v. De León-Quiñones*, 588 F.3d 748 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 2361 (2010). In *Bouthot*, a witness observed the defendant committing a burglary. *Bouthot*, 878 F.2d at 1513. The witness contacted the police, but could not identify the defendant. *Id.* At the original state trial, the witness spoke with members of the victim's family and other witnesses and watched the defendant being brought into court. *Id.* at 1514. Later, during a federal prosecution stemming from the burglary, the witness was shown a photo line-up and identified the defendant as the burglar. *Id.* The court excluded the evidence, reasoning that the "[state court] events were 'very suggestive' " and, therefore, in-court identification by the witness would violate due process. *Id.* In rejecting the Government's argument that "the defendant must demonstrate that there was some improper governmental action" to satisfy the first part of the *Biggers* test, *id.* at 1515, the First Circuit reasoned that:

> Because the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process.

*Id.* at 1516.

In *De León-Quiñones*, the First Circuit reiterated the rationale of *Bouthot*. *León-Quiñones*, 588 F.3d at 754. At trial, two witnesses to a robbery testified that they did not see the robber in the courtroom. *Id.* at 750-51. During a recess, the two witnesses observed De León-Quiñones in handcuffs. *Id.* at 751. After the recess, the witnesses both took the stand again and identified De León-Quiñones as the robber. *Id.* The court assumed the identification procedure was suggestive despite the absence of state action and conducted a *Biggers* analysis. *Id.* at 754-56. The defendant urges us to adopt the First Circuit's reasoning in *Bouthot* and *De León-Quiñones*.

The State counters that adopting the rationale in *Bouthot* would be a "depart[ure] from [our] own precedents and [would] create new constitutional law." *See, e.g., State v. Rezk*, 135 N.H. 599, 601 (1992) ("To determine whether the out-of-court identification procedure was unnecessarily suggestive we ask whether the police have implicitly conveyed their opinion of the criminal's identity to the witness by means of the photographic display." (quotation omitted)); *State v. Allard*, 123 N.H. 209, 213 (stating "our inquiry in this case is whether the out-of-court identifications are the result of such improper police procedures that the in-court identification and other evidence derived from them are inadmissible"), *cert. denied*, 464 U.S. 933 (1983). The State notes that *Bouthot* adopted a minority view, and contends that we should not adopt its reasoning.

We decline to adopt the First Circuit's reasoning that a *Biggers* analysis is required in all "suggestive identification procedures." *Bouthot*, 878 F.2d at 1516. Instead, we hold that the *Biggers* analysis does not apply to a potentially suggestive out-of-court identification where there is a complete absence of improper state action.

The defendant does not allege any improper state action in the out-of-court identification procedures. He argues that the identification was suggestive due to the influence of the media and other witnesses, specifically stating:

> The search for Addison, his arrest, and the announcement of capital murder charges dominated the news in Manchester. Rodriguez admitted that he saw those stories in the newspaper and on television. He admitted he talked to news reporters about Addison. He admitted that they showed him a photo of Addison. DeLeon testified that she talked with [Rodriguez] about Addison, telling him that the picture on the news was the robber with the knife.... Paz said he and Rodriguez talked about the publicity and looked at a flyer or poster together.

> The publicity and conversations about Addison had a dramatic effect on Rodriguez, leading him to make the demonstrably false claim that he identified Addison in the photo line-up.

(Citations omitted.) The defendant concedes that "[t]he inescapable conclusion is that the police did not make any mistakes in [the photo array] process." Accordingly, we do not engage in any further analysis of the out-of-court identification testimony.

■ The majority of federal and state courts agree that an allegedly suggestive pre-trial identification must be the result of state action in order to affect the admissibility of a later in-court identification. *See, e.g., United States v. Kimberlin*, 805 F.2d 210, 233 (7th Cir. 1986) (refusing to find a due process violation where a witness had not been shown a picture of the defendant by a government agent, but rather had seen it on television), *cert. denied*, 483 U.S. 1023 (1987); *United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) (refusing to find the identification suggestive and violative of due process, reasoning that when "there is no evidence that law enforcement officials encouraged or assisted in impermissive [*sic*] identification procedures, the proper means of testing eyewitness testimony is through cross-examination"); *Green v. State*, 614 S.E.2d 751, 754-55 (Ga. 2005) (refusing to find the identification unduly suggestive and violative of due process because the State had no involvement in televising the defendant's arrest); *Com. v. Colon-Cruz*, 562 N.E.2d 797, 805 (Mass. 1990) (stating that the "crucial question" in an allegedly suggestive identification procedure "is whether any possible mistake was the result of improper procedures on the part of the Commonwealth"); *State v. Pailon*, 590 A.2d 858, 863 (R.I. 1991) (refusing to find a due process violation by an in-court identification of a witness after an allegedly suggestive identification absent state action); *State v. Reid*, 91 S.W.3d 247, 272-73 (Tenn. 2002) (finding identification testimony properly admitted because there was no evidence of State involvement in the witness's identifications of the defendant), *cert. denied*, 540 U.S. 828 (2003).

■ The defendant does not allege any improper pre-trial state action affecting the in-court identification of the defendant. Without improper state action, the *Biggers* test "does not apply to in-court identifications." *King*, 156 N.H. at 376 (quotation omitted). Instead, the proper remedy for "any alleged suggestiveness of an in-court identification is cross-examination and argument." *Id.* (quotation omitted). Here, the defendant had sufficient opportunity to cross-examine the identifying witnesses at trial.

■ Although the First Circuit interprets the *Biggers* test to offer the defendant greater protection under the Federal Constitution than our

State Constitution, First Circuit decisions are not binding upon this court even on questions of federal law. *See Martineau v. Perrin*, 119 N.H. 529, 531 (1979). "This State court authority is based upon the parallel position of State and lower federal courts." *Id.* Until the United States Supreme Court has ruled on whether state action is a prerequisite to the *Biggers* test, this court and the First Circuit have parallel authority in passing on federal constitutional questions. *Id.* We hold that the *Biggers* analysis does not apply to a potentially suggestive out-of-court identification where there is a complete absence of improper state action. Accordingly, we reach the same result under the Federal Constitution.

We decline to address the defendant's Rule 403 claim because the issue was not sufficiently raised or argued. *See, e.g., State v. Burke*, 153 N.H. 361, 367 (2006) (Broderick, C.J., concurring specially) (single paragraph argument that was an extension of a previous argument does not warrant judicial review).

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and CONBOY, JJ., concurred.