NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 17-2663

—————————

UNITED STATES OF AMERICA

v.

GREGORY A. JONES,

Appellant

—————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-16-cr-00516-001)
District Judge: Honorable Kevin McNulty

—————————

Argued June 17, 2019

Before: AMBRO, RESTREPO, and FISHER, Circuit Judges

(Opinion filed:  August 20, 2019)

Thomas Ambrosio (Argued)
750 Valley Brook Avenue
Lyndhurst, NJ  07071

        Counsel for Appellant

Craig Carpenito
   United States Attorney
Steven G. Sanders (Argued)
   Assistant U.S. Attorney
Mark E. Coyne
Office of the United States Attorney
970 Broad Street, Room 700

Newark, NJ 07102

Counsel for Appellee

_____

OPINION[*]

_____

AMBRO, <u>Circuit Judge</u>

Gregory Jones appeals his convictions for two separate robberies of the same bank in May and September 2014. After the May robbery, local police investigated and discovered DNA evidence that identified him as the perpetrator. The FBI investigated the September bank robbery. No physical evidence could prove Jones committed that crime; instead, the Government relied principally on an eyewitness identification. Unfortunately, the witness made the identification after she had seen online the mugshot from Jones' arrest for the May robbery.

In April 2015, after local police officers received the DNA match from the May robbery but before the FBI secured its eyewitness identification for the September robbery, the Essex County Prosecutor's Office sent a victim-witness letter to Marlee Ojeda, a bank employee who had been present during the robbery in May. The letter informed her that "Gregory A. Jones" had been arrested in connection with the May robbery. Ojeda shared the letter with her colleagues at the bank, including the teller who

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

witnessed the September robbery. That teller Googled his name and immediately found his mugshot, which prompted her to identify him as the September robber.

The issue before us is whether the prosecutor's notification that Jones was the perpetrator in the first robbery was a state-arranged identification procedure that unfairly tainted the eyewitness identification in the second. The District Court admitted the eyewitness testimony at trial without conducting a suppression hearing. Jones argues this was error because he has a colorable claim that the letter from the Prosecutor's Office was an unduly suggestive identification procedure that violated his constitutional due process rights.

Aspects of this case are troubling, particularly in today's technological environment, where access to a suspect's name permits a witness immediately to review online dizzying amounts of potentially damaging information about the suspect. Nonetheless, we conclude the letter was too attenuated to constitute a state-arranged identification procedure in the September robbery. Thus we affirm.

I.

Gregory Jones was tried for three felonies related to two robberies, in May and September 2014, at a Capital One Bank located in Newark, New Jersey. A jury voted to convict on each of the three counts. Count 1 charged Jones for the May 2014 bank robbery in violation of 18 U.S.C. § 2113(a). Count 2 charged him with the September 2014 armed bank robbery in violation of 18 U.S.C. § 2113(a), (d). Count 3 involved discharging a firearm during the September robbery in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

3

**May 2014 Robbery**

Connie Jeanty, the bank's branch manager, saw a man who had been in line pass a note to Ojeda, one of the bank tellers. The man's face was covered with a scarf, and Jeanty could not see much. She described him as "[e]lderly, tall, skinny, emaciated," S.A. at 206[1], though she indicated she had "bad judgment of height," *id.* at 239.

The note said: "This is a robbery. They ain't no reason for no one to get hurt. I have a gun and will shot [sic] if I have to." *Id.* at 641. Ojeda gave the robber $4,000 in marked bills along with a dye-pack, a device concealed inside a stack of paper currency that would cause red dye to explode and contaminate the person holding it. The robber then ran out of the bank.

The Newark Police Department investigated the May robbery. Officers recovered a scarf and glasses, along with dye-stained bills and a hat found inside the scarf, all of which were discarded by the robber several blocks from the bank. Newark police tested these items for DNA, which was found to match Jones' DNA.

**September 19 robbery**

On September 19, 2014, a man in line approached Catricia Occidor's teller station, stuck a handgun through the tray at the bottom of the window, and said "Lady, this is a robbery." *Id.* at 216, 270. When Occidor hesitated, he fired the gun into the ceiling and threatened to shoot Occidor if she did not give him money. After taking $2,000, the robber ran out of the bank.

---

[1] Cites to "S.A." refer to the supplemental appendix filed by the Government.

4

Jeanty described the September robber as "elderly, skinny, [with the] same emaciated face," and because he had nothing covering his face, "salt and pepper [facial] hair." *Id.* at 217. When Jeanty heard his voice, she thought "it sounded just like the same person from before, and this time it's escalated." *Id.*; *see id.* at 227–28. At the same time, when asked on direct examination if she saw the September robber in the courtroom, she said "I'm not sure." *Id.* at 220.

Occidor, who had not been present for the May 2014 robbery, described the September robber at trial as slightly taller than 5'6", of medium build, and with a salt-and-pepper goatee. *Id.* 273. Because Occidor got a good look at the robber's face, she met with a sketch artist in October 2014. *Id.* at 273, 444.

The FBI, not the Newark Police, investigated this robbery because a firearm was used. The FBI did not find physical evidence to prove who committed the crime but interviewed bank employees immediately after the robbery and again in late April 2015.

**Victim-Witness Letter**

In early April 2015, Newark police arrested Jones for the May robbery after receiving a DNA hit on the items recovered from that crime. Soon thereafter, the Prosecutor's Office sent a victim-witness letter to Ojeda informing her that "Gregory A. Jones" had been arrested in connection with the May 2014 robbery. This letter was purportedly sent pursuant to the broad victim and witness rights protections under New Jersey law. *See* N.J. Const., art. I, para. 22 (stating that victims must "be treated with fairness, compassion and respect by the criminal justice system"); *see also* N.J.S.A. § 52:4B–36.

5

Ojeda shared the letter with Occidor.[2] Occidor testified at trial that she read the letter and performed a Google image search for "Gregory A. Jones." Among the results, she saw a picture of his mugshot from mugshot-record-search.com, prompting her to conclude that Jones was the September robber.

A few weeks later, FBI agents returned to the bank to conduct interviews as part of their investigation of the September robbery. During their interview with Occidor, she admitted to reading the letter from the Prosecutor's Office addressed to Ojeda and searching for Jones online. The FBI report summarizing these interviews notes, "Ms. Occidor stated that she also saw the picture of Jones and she immediately recognized him as the person who robbed the bank [in September]. There was no doubt in her mind that it was Jones who committed the [September] robbery." S.A. at 647.

**Procedural Posture**

In November 2016, a federal grand jury returned an indictment charging Jones in three violations of federal law. He pled not guilty.

Jones moved pretrial to suppress the eyewitness identification in the second robbery. He claimed that the letter from the Prosecutor's Office was an unnecessarily suggestive state-arranged identification procedure. He also requested an investigative hearing to prove that sending the letter before the FBI sought the witness identification in

---

[2] It is disputed whether Ojeda also shared the letter with Jeanty. Occidor testified that she and Jeanty read the letter together. FBI Agent Special Agent Douglas Mann testified that Jeanty admitted to seeing Jones' photos online when he interviewed her in April 2015 as part of his investigation of the September robbery. But Jeanty at trial denied seeing the letter or Jones' pictures online.

6

the September robbery was unduly prejudicial under the Constitution's Due Process Clause.

Judge McNulty denied the motion to suppress without granting a hearing after concluding the letter was not a state-sponsored identification procedure: "[O]nly a police-arranged identification procedure . . . triggers the due process remedy of pretrial exclusion from evidence. Here, the connection between the police and the out-of-court identification was attenuated and indirect." *Id.* at 128.

At trial, the Government relied principally on four pieces of evidence: (1) DNA evidence showing that Jones committed the May robbery; (2) Occidor's in-court identification of Jones as the September robber; (3) Jeanty's testimony that she was sure one robber committed both crimes; and (4) videos of the robberies which, along with two photographs of Jones taken in December 2014, the jury could use to compare the descriptions of Jones by Jeanty and Occidor.

Jones introduced testimony from a police sketch artist to show that the person Occidor had described in October 2014 as the September robber did not resemble him. He also introduced testimony from an expert witness on the fallibility of human memory, identifications made by witnesses in stressful situations, and the effect on recollection of having seen a picture of the purported suspect.

In addition to standard instructions on witness credibility, the District Court issued three pages of special jury instructions on eyewitness identifications from the Third Circuit Model Criminal Jury Instruction 4.15.

7

The jury convicted Jones on all counts, and he was sentenced to 240 months in prison. He raises one claim of error on appeal: that the District Court did not conduct a suppression hearing on the eyewitness identification of the second robbery. He requests we remand the case for the Court to hold that hearing to determine whether the identification should have been excluded from trial. Because the identification related to the September robbery, only the second and third convictions are implicated in this appeal.

## II.

Where a suppression order is denied, we review the underlying facts for clear error but review *de novo* its legality given properly found facts. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006).

A defendant is only entitled to a suppression hearing if the identification is state-arranged. *Perry v. New Hampshire*, 565 U.S. 228, 232–33 (2012). Even when so, he then needs to show a "colorable claim" that the procedure violated due process. *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996).[3] "Our decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array." *Perry*, 565 U.S. at 232–33; *see also United States v. Zeiler*, 470 F.2d 717, 720 (3d Cir. 1972) (noting courts "scrutinize[] pretrial identification procedures to prevent police and prosecuting officials from using

---

[3] This claim requires evidence that could satisfy a two-step inquiry: (1) that the identification procedure was unnecessarily suggestive, and (2) the suggestive identification procedure created a substantial risk of misidentification. *Perry*, 565 U.S. at 236.

unduly suggestive techniques presenting a high risk of misidentification"). [4]  But *Perry* leaves unanswered what constitutes a state-arranged identification procedure.  *See Perry*, 656 U.S. at 241–44.

The District Court held that the identification here could not be state-arranged because the witness "went online and did [her] own research."  S.A. 128.  Similarly, the Government argues the identification cannot be arranged by the state because the witness made a "private search."  Gov. Br. at 22.  We think this goes too far.  Because *Perry* "aim[s] to deter police from rigging identification procedures," it seems odd to draw a distinction between cases where police directly rig the identification and those in which the police manipulate the outcome by giving a witness all the tools to taint it herself.  *See Perry*, 565 U.S. at 232–33.  At the same time, there is a dearth of caselaw explaining the contours of a "state-arranged identification procedure" under *Perry*.

There is some support for the (entirely sensible) proposition that the state arranges an identification procedure if it provides a suspect's name or other identifying information directly to a witness.  *See Cornwell v. Bradshaw*, 559 F.3d 398, 414 (6th Cir. 2009) (suggesting that "the police themselves suppl[y] suggestiveness" if they "give [the witness] the name of the person who ha[s] been arrested"); *cf. State v. Gomez*, 937 So. 2d 828, 832 (Fla. Dist. Ct. App. 2006) (finding that "the communication of [the suspect's]

---

[4]  Notwithstanding the policy goals of this doctrine, a defendant need not show negative intent to render the state's procedure unduly suggestive.  *Perry*, 565 U.S. at 251 ("[W]e specifically have disavowed the assumption that suggestive influences may only be 'the result of police procedures intentionally designed to prejudice an accused.'") (quoting *United States v. Wade*, 388 U.S. 218, 235 (1967)).

9

name" was an unnecessarily suggestive state-arranged identification procedure). Today, simply providing a name can substantially undermine a witness's capacity for fair identification. The name (or other similar identification information) is all that separates the witness from a few-second Google search, which reveals any available pictures and information relating to the suspect's background, life experiences, and other minutiae. The search results are even more prejudicial in cases, like here, where the suspect has an arrest history and the potential witness sees a mugshot along with his record. *See Dennis v. Sec'y, Pa. Dep't of Corr.,* 834 F.3d 263, 328 (3d Cir. 2016) (McKee, C.J., concurring) (emphasizing that 37% of witnesses mistakenly identify an innocent person "if the witness previously viewed that innocent person's mug shot").

On the other hand, there is no state-arranged procedure when the state broadly disseminates suspect information to the public that a witness finds on her own. *See Zeiler*, 470 F.2d at 720 (concluding that the broad publication of mugshots in news sources is not a state-arranged identification procedure); *cf. State v. Martin*, 505 S.W.3d 492, 501–03 (Tenn. 2016) (holding that publication of mugshots in a state-run "Who's in Jail?" website was not "improper state action in the identification procedure"). In other words, the state may be a but-for cause of the identification without conducting a state-arranged identification procedure. For example, it may legitimately release pictures to news outlets or websites for other purposes, such as notifying the public that an arrest has been made or gathering tips on the whereabouts of a suspect who is on the run. *See Zeiler*, 470 F.2d at 720.

10

This case falls somewhere in the middle of these two poles. Here, the State conveyed Jones' identity directly to someone connected to an ongoing investigation. But this identification was also attenuated: (1) the letter was sent to Ojeda, a witness in the first case only, not Occidor in the second case; (2) it only referenced the May robbery and did not suggest Jones was involved in the September robbery; and (3) the FBI, rather than the local police, investigated the second robbery. It is worth discussing each of these points in turn.

To start, the Prosecutor's Office provided a standard update to a May witness notifying her that Jones had been apprehended in that robbery; it made no mention or suggestion that he was a suspect in the September robbery. Ojeda then decided to pass the letter on to Occidor (and possibly other coworkers), who Googled Jones and identified him in the September robbery.

Second, the Prosecutor's Office did not give Jones' name to a witness to the September robbery. It sent the letter to Ojeda, who was not even present at the bank in September. Though it sent a letter to someone employed at the bank during both robberies, the Prosecutor's Office did not communicate any information about the suspect to a witness to the second robbery. We are skeptical that this factor alone would prevent a procedure from being state-arranged. However, viewed in context in this instance, that the letter was sent to a non-witness weighs against the contention that the Government arranged a suggestive identification procedure.

Finally, different authorities—state and federal—were responsible for the two investigations. The central policy goal articulated in *Perry*, deterring government

11

officials from rigging identifications to secure convictions, may be less pressing where the state authority only prosecuted Jones for the May robbery. *Perry*, 565 U.S. at 232–33. Here, too, we are hesitant, as state and federal law enforcement entities have incentives to work together. But we note this feature as a further point of attenuation in this case.

Without drawing a firm line, we conclude that the letter from the Prosecutor's Office was not enough to constitute a state-arranged procedure. Our decision rests on the totality of the circumstances here rather than any one particular feature of this case.

Thus we affirm.